Champion Security engaged in discrimination against Mr. Clark, appellate and plaintiff below, and this discrimination was based on his diabetes, which is a protected disability. Mr. Clark lodged a complaint about this discrimination, and in retaliation, Champion Security terminated Mr. Clark. This is a rare case where we actually have direct evidence of discrimination. Mr. Clark was terminated because he passed out one time as a result of hyperglycemia, a symptom of his diabetes. Thus, we have a forbidden factor issue here. And in fact, the hyperglycemia was objectively determined by a hospital on the day that Mr. Clark was terminated. Yet, despite this objective finding, the appellee, the employer, claims that Mr. Clark was terminated because he was found not awake at his desk. Are you Mr. Stoy, by the way? Yes, ma'am. Mr. Stoy, is this a situation where this is kind of a one-off situation with his loss of consciousness? It's not like in the sleep apnea cases where they can't do the job because they have to be alert at work? Is this just an extraordinary event of his with the diabetes, or is this something that plays into his qualification issue? Because, you know, a number of these sleeping at work cases get into whether or not you can do the job. Yes, ma'am. It is absolutely distinguishable from the case that counsel cited in his supplemental case, which is another Clark case that my firm handled. And in that case, the Fifth Circuit found that there was no discrimination or retaliation. And in that case, the person did actually suffer from narcolepsy that prevented them from performing the essential job functions. Same thing with the Southwest Airlines case that the Apolese cites. That was a ground flight instructor for Southwest Airlines who had a history of, I believe, eight or nine months where he was suffering from narcolepsy and was given leave to handle certain things. And same thing with the other Clark case. So it absolutely is distinguishable. Mr. Clark, in this case, suffered one episode, and they claim two, but one episode where he was found unconscious at his desk. And one episode. Yes, Your Honor. What accommodation is there that would have allowed Mr. Clark to perform the essential duties of his job while asleep or while in a diabetes-induced unconsciousness? Well, I think that goes back to the fact that this was a one-time thing. There were accommodations made, and as the district court pointed out, that included a refrigerator in his office that allowed him to keep his insulin. And then they allowed him to go to his doctor's appointments. But this is a one-time thing. I mean, it would be the equivalent of if someone has a heart attack or a stroke at the office and there's no objective determination to see if this was something that is like narcolepsy where we have to deal with it on a continuing basis. Or a one-time episode where the diabetes, unfortunately, gets out of control. What if, for example, the diabetes medicine was ineffective and he was properly controlling his diabetes and it just didn't work that day? So this is not an accommodation for him to be able to sleep at work if he's having an episode. It's that he needs other types of accommodations, getting a juice or something at regular times and checking his blood sugar, etc. I don't think accommodation is the biggest deal when it comes to accommodation for his diabetes. Now, there was no engagement, though, in the interactive process once he went to the hospital because he couldn't, in fact, engage in the interactive process. He was just passed out at that time. So you're saying that they could not terminate him at that point because of his medical situation? Correct. At that point, Judge Elrod, the employer had a duty to ask for more information. There's even evidence that, if I can find it here, the man who terminated him responded to the executive vice president of the company and said, after my call, Charles stated to me he did not remember getting up this morning or coming to work and woke up sprawled out in his chair with the door closed. Charles stated nobody bothered to check on him. He might have been having a diabetic emergency. What about the September 2016 photo issue where the manager received a picture of Clark asleep at the desk, allegedly? Yes, the alleged sleeping at the desk. Unfortunately, a portion of the file was destroyed, the investigation file, some information for which we were not able to get. But, again, I'd have to provide more information on that. You mean the company's file? Yes, yes. The underlying file for the underlying disability discrimination was destroyed by the company. So is there evidence in the record, maybe through testimony or otherwise, that the manager got a photo of him sleeping at his desk? Yes, yes. So he slept at his desk, allegedly, in September and then again in December, but the December was a serious medical event? Well, I don't think that he was sleeping at his desk. We do not say that he was sleeping at his desk in September, no. What now? You think there's a fact issue in whether he slept in September? Yes, absolutely. Yes, and this case comes down to that fact issue. If he had slept in September, do you lose this case? No. Okay. He could have two diabetic incidents? And still be qualified to perform the essential job functions of a personnel manager for a security company? Absolutely. He could absolutely be able to do that, and that's what the question comes down to, is could he perform the essential job functions? Okay, what about the August 2016 comments? Do you deny that those are in the record, that he was snoring in his office in August 2016? I do not deny that they were in the record, but again, I point it back to the ability to perform the essential job functions. You claim that there's direct evidence, not circumstantial, but direct evidence of disability-based discrimination, and that's uncommon, that's rare. So, point me to a statement, a document, that directly and expressly links his disability with the decision-maker's choice to terminate him. What is the direct evidence smoking gun? Yes. So, on the day Clark was filed, once he was awakened, he headed directly to the hospital, yet no one from Champion made any attempt to verify whether he was unconscious, as a result of a health condition, or whether he was merely asleep at his desk. I think what I cited earlier, and I will go back to that, where Mr. Bentz, his supervisor, states that he might have been having a diabetic emergency. But what do you have linking that presumption to the decision to terminate him? I guess it would be going back in time to the fact that after he made the, well, I guess we're getting into discrimination versus retaliation, but I would say that we have to take a look back further at where this all began, and him making the allegations of discrimination. But, I would point the court to the fact that he was having a diabetic episode. One thing I'd really like to point out to the court is the footnote in the district court's opinion. In 2007, President Bush signed into law the Americans with Disabilities Amendments Act, which set forth the conditions, and this is going to be talking about circumstantial evidence, but I think it is imperative, conditions to protect under the act. The amended act mandated that the determination of whether an impairment substantially limits a life activity be made without regard to the ameliorative effect of the mitigating measures. Thus, Mr. Clark's impairment is measured without regard to the ameliorating effects of insulin. Yet, when discussing whether Mr. Clark is a qualified individual in the burden shifting analysis, the district court judge added a footnote stating, and I quote, The evidence indicates that it was his own neglect in failing to monitor his diabetic condition, which resulted in his unconscious state. The district court basically just said, I see no direct evidence, and then focused its attention on the circumstantial evidence of the discrimination, and accepted the fact that, of course, diabetes is a disability, but then immediately turned to whether Mr. Clark was a qualified individual, and I believe overlooked the 2007 amendments, because whether Mr. Clark was complying, I guess, with the standard of care for managing diabetes or not is not a decision that the district court should have made. Well, assuming argument that he was, in fact, qualified, he still could be terminated for repeatedly falling asleep, couldn't he? I think, again, this now comes back to the fact issue of, I think the words are important here, falling asleep versus being unconscious, and that was being unconscious once, and maybe falling asleep twice. No, I would say he was unconscious twice. Every single time? Yes. Even in August? So every single time, all three times he's unconscious? Yes, but I would say that although I think August is more than one time, but you think he's, I mean, that's, at some point, though, does he have a responsibility to, not related to his qualification for the job, but does he have to be monitoring a little, some of it? I mean, is that on him at any point? Does he ever have to manage to make sure that he's not getting into that state? I would say that under the 2007 amendments, that's not a consideration. He never has a responsibility to make sure that he's monitoring his blood sugar and eating appropriately and taking the medicine. That's never on him. I think that would come down to a fact issue of whether he was able to perform the functions of his job. Well, is he able to perform the functions of his job? Yes. If he is sleeping, when he's supposed to be monitoring for security? I'm not trying to be harsh with your client. These are legitimate employment law questions. Is he able, how is he able to perform it if he's supposed to be alert and he's either in a diabetic coma or sleeping? So, he's not a security guard for Champion Security. He's a personnel manager. But being alert is part of the job, right? Obviously, someone has to be alert while at work, but an episode here or there as a result of diabetes, when viewed in light of the job functions of a personnel manager versus the job functions of an actual security guard. So, he's not monitoring some kind of situation that somebody could be attacked or be robbed or something? Correct. He is not. Personnel manager, not security guard. And I think that when we look at the factors of the Southwest case and the other Clark case, which this court looked at, that we can see in those cases there was all kinds of accommodations made for people with narcolepsy, one of which was a ground flight instructor. But what accommodation did he seek? I know he sought about the shaving and the shirt, and those were accommodated, even if allegedly there was some disagreement about it at the time. Those were, in fact, accommodated. What accommodation did he seek about his diabetic coma situation? Excuse me. I'm sorry. I apologize. Bless you. There were not accommodations discussed or sought at that time because he was terminated when he had the diabetic coma. But back in August or in September. I don't think that it arose to a point where he was determined incapable of performing his essential job functions. But didn't he know in August that they were talking about him snoring in the office? Did he not know that? I would have to go back and check the record on that. Did he know in September when there's allegedly a photo of him going around showing him sleeping? Did he know that? I'd have to check. Okay. So if he did know, wouldn't that put it on him to say, oh, my goodness, I need to seek some sort of work with him so I can get my blood sugar checked at a regular basis, and maybe I need to be excused for longer lunch hours? Wouldn't that be on him at that point to ask for accommodation? It's always the employee's duty to ask, right? If it so, in fact, rises to the level where it impairs their ability to perform their essential job functions, then yes. But we do not have a security guard here. We have a personnel manager. Okay. May it please the Court. Good afternoon, Your Honors. Courtney Wilson on behalf of the appellee, Champion International Security. Your Honors, I want to start where the appellant started. This is a claim of discrimination they have based, chosen to base, on direct evidence. There is no direct evidence whatsoever in this record. They haven't cited any in their brief. They didn't point to any in their argument. They have not pursued a circumstantial evidence case. Their opening brief says this is not a McDonnell Douglas case. This is a direct evidence case. Direct evidence, to your question, Judge Willett, is a statement something like, Clark's at it again. His diabetes is acting up. He's asking for an accommodation. Let's get rid of him. That's direct evidence. There isn't anything remotely like that. In fact, in response to your question, counsel couldn't even point to a statement or a document or an utterance of any kind that had to do with why they terminated him. So if they were willfully blind to the fact that he was out because of his diabetic coma, that would be circumstantial and not a direct evidence case? I'm not even sure that would fit circumstantial, but it's certainly not direct evidence. If they didn't follow, he gave them the documents that said he was at the hospital. Let me clear that up. There is nothing in this record that says that Mr. Clark was ever unconscious. There is nothing in this record that says that Mr. Clark was unconscious because he had diabetes. And there is nothing in this record that says that my client knew he was unconscious because he had diabetes. And all three of those things must be true to sustain a primophagia case. There isn't evidence of one of them. Mr. Clark, his story is that he had amnesia up until the time that he awoke from his chair. He doesn't remember getting up in the morning. He doesn't remember driving to work. He doesn't remember how he ceased to be awake. Is that consistent, though, with the diabetic episode? We don't know because there is no evidence in the record about his health condition at the time that he was not awake. He didn't proffer it. He didn't proffer a medical expert, a hospital record. I thought he has a record about his – what kind of record did he have when he went to the hospital? He went to – he told people at work he was going to the emergency room. That really is the extent of what my client knows about – he said he was going for possibly his diabetes. That's the extent that the record reflects my client knowing anything about it. Well, counsel, you know, we see a lot of employment law cases. We're pretty experienced in this area of the law, probably not as experienced as you in opposing counsel. But we see a lot of these cases. And normally if somebody is going to the hospital, the employer wants to see documentation or something after the fact or something. And it seems like here they didn't wait at all. They did not. They terminated him. They called him on a cellular phone and told him that he had been terminated. And that was based on the – as you pointed out, the prior incidents added to this one, which another employee had reported. And then his supervisor went down the hall to his office, saw that he was not awake. He testified he didn't appear to be in distress. And then the next thing he knew, Mr. Clark was awake, walking around, talking to people. There's no medical evidence that it wasn't caused by his diabetes or that it was. So the record is a zero, and they haven't sustained their case. But unless we check our common sense at the door, diabetic coma, you don't get up, walk around, and talk to people without any sort of intervention whatsoever. It just does not happen. But he didn't proffer any evidence that it did happen. And he didn't proffer any evidence that my client knew it happened. Is the grooming incident about the beard or the part about the shirt, is that pertinent to this? Not really. Your Honor, he has a hostile work environment claim, which is premised upon some resistance to his claim to be allowed to leave his shirt tail out and not to shave. But both of those accommodations were granted. They weren't related to his diabetes as far as we knew, and this occurred months earlier. That's not a hostile work environment. The circuit's cases are very clear as to what it takes to establish a hostile work environment, and it is constant and humiliating verbal or physical attacks. It is not a disagreement over whether you're going to shave or tuck in your shirt tail, much less a disagreement over shaving and tucking in your shirt tail where he was allowed an exception to both of those policies. And, again, that happened months before he was terminated. Their retaliation claim, their final claim, is premised upon his complaints about the grooming issues. And for several reasons, the lower court was correct in granting summary judgment on the retaliation claim. Because, first off, complaining about grooming issues is not protected activity. He was not complaining about a violation of the Americans with Disabilities Act. He was complaining about how he was treated when he asked if he could not shave because he had eczema and dry skin, and if he could not tuck in his shirt tail because his shoulder was recovering from an operation. These aren't disabilities. Well, the eczema could be related to the diabetes, couldn't it? I thought they alleged that. He alleged that's his opinion. There's no medical evidence to suggest the two are related. Well, assuming arguendo that it is, what's your position on that? Assuming that eczema is related to diabetes? Yes, as he says in his brief, he thinks it is related. Because you have to have an objectively reasonable belief that you are complaining about a violation of the ADA. That's your first prong of the retaliation. Assuming arguendo that that is an objectionably reasonable belief, what say you then? That his doctor did not share that belief because we have a doctor's note in the record that says he can't shave because he has eczema and dry skin and doesn't say anything about diabetes. We contend that's not an objectively reasonable belief, nor even one that was held in good faith. Even if you got past that prong, obviously we've got the legitimate, non-discriminatory, and non-retaliatory reason for his termination, which is he was found sleeping at work. And counsel alludes to the fact that he was an office worker, not a security guard. He conceded that as the personnel manager, he was involved in terminating several employees for sleeping on the job. He conceded that was important for everybody in this company because it's important for the security guards. He conceded that that is a written and established policy of this company, that if you sleep on the job, you get terminated. For managers too, not just security guards? Yes, it's just a policy for all the employees. Is the policy say be alert at all times? What was the policy again? I cannot quote, Your Honor, the language of the policy. I thought it said something about alert. Mr. Clark conceded that it would on its face apply to this situation, and he was a personnel manager. So I think the intent there is you have to set an example if you're going to hold the security guards to the same standard. You have to set the same example for everyone. Do you have anything else, counsel? Do you have anything else, sir? Yes, Your Honor. Another question that was raised, well, Your Honor asked about is this one-off loss of consciousness. Obviously, we don't know. He worked in an office. He could have been not awake on a daily basis as far as we know. We don't have that evidence. But when he was caught or discovered being not awake, as Your Honor alluded to, this was not the first time this issue had arisen, and we were being consistent. What he's really asking for is not to avoid discrimination but to have this court mandate discrimination. He is asking for us to treat him differently than any other employee caught in exactly the same situation. He doesn't contend that any other employee found sleeping on the job would be terminated improperly so. He says that because he has a disability, he should be treated differently. But that's not a discrimination case. That's a failure-to-accommodate case. If there was some accommodation that we could have made and were obligated to make for him and didn't, then he would have an argument. But what he is asking for is saying, you terminated me for the same reason you would have terminated anybody else, but I'm different, so you have to act differently. That is the opposite of what the Americans with Disabilities Act says. And that brings up the question of what is the accommodation. And counsel indicated he didn't request any accommodation. He did request that he keep insulin in his office in a refrigerator because it has to be refrigerated, and he was accommodated. We allowed him to do that. He did say he requested an accommodation of going to more frequent doctor's visits because of his diabetes, and he admits that was accommodated. There's no dispute about that. There was no friction about that. These things were provided to him. What he doesn't say is what is the accommodation you say you need so that you will not suffer some complication of diabetes that renders you either asleep or unconscious when you're supposed to be working, when you're in your office. He didn't ask us for such an accommodation, which he's required to do under the ADA. He didn't identify such an accommodation in the lower court. He didn't identify such an accommodation in his brief, and he hasn't identified one today. There is no accommodation, at least as far as we can tell, that would have allowed him to do this job without the recurring risk that he would either doze off or become unconscious when he was supposed to be at work. So he has no failure to accommodate claim. The court's decision in Birch, which cited the Seventh Circuit's decision in, I think it's pronounced Seifkin, was actually an employee, a police officer who had diabetes, who poorly managed, I don't want to say poorly, ineffectively managed his diabetes. And as a result of that, he lost some degree of consciousness and caused an auto accident. He was terminated. He came back and said, well, this happened because of my diabetes. It happened because I couldn't manage it correctly or effectively. That's what caused the accident, just like Mr. Clark was caused to doze off in his version. And the Seventh Circuit said, but the accommodation you're asking for is just to overlook what happened. It's just to treat you differently than an employee who doesn't have a disability. You're not asking for a genuine accommodation. You're not identifying something the police department could have done that would have enabled you to overcome whatever the problem was, that would have enabled you to remain alert and conscious. And therefore, that's not an accommodation that's cognizable under the ADA, and they granted summary judgment. And this court in Birch, which was a recovering alcoholic case, cited Seifkin with approval for just that round. Birch got in trouble at work, immediately also went to a medical provider, went into rehab for alcoholism, and wanted his job back. When he didn't get his job back, he sued, and this circuit affirmed – I think it may have been judgment as a matter of law after a trial or summary judgment, same standard. For the same reason, all Birch was saying is the accommodation I want is my job back. Sure, my behavior was inappropriate, but I have a disability, so you have to treat me differently than you would have treated another employee with that disability. Again, that is not what the ADA says. If your honors have no further questions, I will not take up more of your time. Thank you, Counsel. We have your argument.  I would like to first address the issue that you brought up with opposing counsel about whether the employer was aware that while Mr. Clark was in the hospital, he had been suffering from unconsciousness as a result of his diabetes. There's a few things in the record. First, Mr. Bents, Mr. Clark's direct supervisor, admits that he had discussed hyperglycemia and the risk of passing out with Mr. Clark and another employee on multiple occasions, or at least on one occasion. Excuse me, that was a misstatement. And that he admits that he was aware that if insulin levels reach a certain point, unconsciousness can occur. Now, while Mr. Clark was in the hospital, he told Mr. Mays, who was involved in this hierarchy, that he was diagnosed with hyperglycemia. So there we do have a fact issue as to whether they knew that he was unconscious as a result of his hyperglycemia, which was caused from his diabetes. I think, Judge, what needs to be looked at here is the span of events. And the executive vice president saying that if you will shave, we will give you a raise. That is discrimination right there on its face. It would be the same thing as telling someone in a wheelchair, if you will get up and walk, I will give you a raise. They, Mr. Clark, was not able to do, chose not to do that, chose not to shave. And that, he reported that discrimination to Mr. McCoy, who then, you seem to have a question, who then instigated an investigation. And then Mr. McCoy, the executive VP, along with Mr. Mays and Mr. Bentz, basically started coming up with ways to terminate Mr. Clark. I'm sorry, but where in the record does it say that they knew that his eczema was related to his diabetes? I'm glad you brought that up. Because your wheelchair hypo, it fails if they just think he has eczema. You don't get, I mean, they could give a dispensation for eczema, but that's not related to, it wouldn't work in this case. Absolutely. And I'm glad you brought that up because that was a point the opposing counsel discussed and said that there was no link there. But, in fact, there was a doctor's note provided that said that he has eczema and cannot shave. Then the employer asked for clarification of that, and that is when Mr. Clark responded and said that the eczema is related to my diabetes. Now, whether there needs to be expert testimony or not, I think that would be a contention between the parties. But the fact remains that there is now a fact issue as to whether the eczema is related to the diabetes. Right, but that's the time period where they assented to his having the beard. That's not the same time period where they offered him a raise. One was either in, it's not clear, but it was probably in January, and this other one is in April. So those are not the same time period. Maybe help me with that because the time where they offered him the raise is not in the same conversation where he has a doctor's note and that he's relating it to his diabetes. It took time for these events to play out. Right, but so they didn't know at the time. It's not the same as your wheelchair hypo. I think that it is. Because they didn't know that it was related to the diabetes on that day. At that point they did. What day was the offer of the raise? I do not have a direct citation for that. I would have to provide that in a letter to the court. As I sit here right now, I don't have that. Okay. Why don't you, you have just a little bit of time, so go ahead and whatever else you want to say. Well, and so I would say that they continued, there are plenty of emails in the record where they then basically plot and plan to terminate Mr. Clark. Like, let's get him out of here. Let's see what we can do. I want to start applying pressure on him to leave. That's, it's a retaliation case cut and dry as long as, as well as direct evidence of the discrimination. Thank you. Thank you very much. We have your argument and this case is submitted.